Filed 8/27/25  P. v. Wellington CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B332168 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA089785) |
| v. | |
| DUMAURIO WELLINGTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas Rubinson, Judge.  Affirmed.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Sophia A. Lecky, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Dumaurio Wellington appeals from a judgment entered after a jury found him guilty of first degree murder and found true the allegation that he personally used a metal pipe as a deadly weapon in committing the murder. The trial court found true the allegation that Wellington had two prior convictions for serious felonies and denied his motion under Penal Code section 1385, subdivision (c), to dismiss two five-year sentence enhancements for those convictions.[1] The trial court sentenced him to 61 years to life in state prison.

Wellington asks us to reverse his conviction, arguing: (1) the trial court prejudicially erred by declining to instruct the jury on the lesser included offense of voluntary manslaughter on a theory of sudden quarrel or heat of passion; and (2) Wellington's defense counsel rendered constitutionally ineffective assistance by failing to present a voluntary intoxication defense, by failing to object to a prosecution witness's testimony based on surveillance videos that the prosecutor played for the jury, and by allegedly mischaracterizing motive as an element of murder during closing arguments. We conclude that the trial court properly declined to instruct the jury on voluntary manslaughter because no substantial evidence supported such an instruction. We also conclude that the record does not demonstrate that defense counsel's performance was constitutionally deficient or prejudicial.

In the alternative, Wellington asks us to remand to the trial court with instructions to reconsider his motion to dismiss the enhancements for his prior serious felony convictions, arguing that the court abused its discretion by failing to give great weight to five mitigating circumstances enumerated in section 1385,

---

[1] Undesignated statutory references are to the Penal Code.

subdivision (c). We conclude that the evidence before the trial court proved the presence of only two enumerated mitigating circumstances, and that despite their presence, the court acted within its discretion by imposing the enhancements. Accordingly, we affirm the judgment.

## BACKGROUND

On January 2, 2019, at the North Hollywood Metro station, William Bailey suffered multiple blows to the head with a metal pipe, sustaining wounds that proved fatal within two weeks. The Los Angeles County District Attorney charged Appellant Wellington with the murder and alleged that he personally used a deadly weapon (a metal pipe) in committing it. It was further alleged that Wellington had three prior serious felony convictions (§ 667, subd. (a)) that were strikes within the meaning of the "Three Strikes" law (§ 1170.12, subd. (b)).

Before Wellington's case went to trial, his codefendant, Arthur Anderson, pled no contest to a charge of assault by means of force likely to produce great bodily injury. The following is a summary of pertinent evidence presented at Wellington's trial.

### A. Wellington's interactions with the victim

At trial, to prove Wellington's actions before and during the homicide on January 2, 2019, the prosecution played surveillance videos from three cameras on a Metro Orange Line bus (People's Exhibits Nos. 2, 3, & 20) and a camera at the North Hollywood Metro station (People's Exhibit No. 21), where the homicide occurred. The parties stipulated that the videos were authentic.

The prosecutor played the surveillance videos for the jury during direct examination of Timothy Thrash, who drove the bus

3

from Chatsworth to North Hollywood on the night of the homicide.  In between clips from each video, Thrash narrated what he saw on the videos.  To the extent that Thrash independently recalled personal observations from the night of the homicide, he testified to his observations.

The surveillance videos showed that at 2:23 a.m., at the Chatsworth Metro station, a man in a black coat (later identified as Wellington as described below) boarded Thrash's bus with a man in a red hoodie (Wellington's former codefendant, Anderson) and a man in a ski mask (the victim, Bailey).[2]  In addition to the black coat, Wellington wore a black hoodie, dark Levi's jeans, light gray shoes, and a gray-and-blue striped beanie.

Bailey took a seat at the back of the bus, while Wellington and Anderson took seats near the middle, by the rear door.  About ten minutes later, Wellington walked toward the back of the bus and appeared to speak with Bailey for over a minute before returning to his seat.  While seated, Wellington produced a roughly eight-inch metal pipe from a backpack, removed a piece of metal from the pipe, and extended the pipe's length to over a foot.[3]

---

[2] Neither party called Anderson as a witness, and no evidence at trial identified him as the man wearing a red hoodie in the surveillance videos.  Both parties' briefs state that this man was identified as Anderson at an unspecified time, and refer to him as Anderson.  We refer to the man as Anderson for consistency with the briefs and readability.

[3] The videos showed that Wellington and Anderson exchanged possession of the metal pipe multiple times and sometimes placed it down before picking it up again.  We note the pipe's position only when relevant.

As the bus continued toward North Hollywood, Wellington and Anderson each twice approached Bailey and appeared to speak with him before returning to their seats by the rear door. Between conversations, Wellington took a pair of black gloves out of a backpack and put them on. After retaking his seat, Wellington took a blue bandana out of the backpack and tied it around his face.

At 3:10 a.m., the bus arrived at North Hollywood station, the last stop before the bus was scheduled to begin its return route to Chatsworth 10 to 15 minutes later. Wellington, Anderson, and all other passengers except Bailey exited the bus, while Bailey slept in his rear seat. Thrash (the driver) woke Bailey and told him to exit because it was the last stop. Before Bailey exited, Wellington re-entered the bus with the metal pipe, approached Bailey, and exited again.

Soon after, Bailey walked toward the exit, but Anderson re-entered the bus, blocked Bailey's path, and pushed him. Wellington also re-entered the bus and stood near Anderson, who held the metal pipe over his shoulder as he appeared to argue with Bailey.

Thrash, who saw this altercation from about five feet away, heard Anderson (who was now holding the metal pipe) tell Bailey, " 'Give me back my pipe, or I'm going to hit you. I'm going to hit you.' "[4] Anderson also said, " 'You cannot be assaulting people. If you assault him, hit him, I'm going to call the police. You need to

---

[4] The parties agree that the pipe Anderson told Bailey to give back must have been different from the metal pipe that, as noted, Anderson was holding at the time. However, no other evidence concerning the second pipe was presented at trial.

get off the bus.' " In response, Bailey "was trying to calm down" Anderson, telling him " 'Okay' " and " 'Let's just go outside.' "

## B.    The homicide

The surveillance videos showed that at 3:14 a.m., Wellington, Anderson, and Bailey exited the bus. Immediately after, Anderson pushed Bailey.

As Wellington stood nearby, Anderson and Bailey appeared to argue for several minutes, during which Anderson kicked Bailey and twice attempted to punch him, and Bailey pushed Anderson twice. After attempting to push Anderson a third and final time, Bailey stumbled and walked a short distance away.

Wellington, brandishing the metal pipe, followed Bailey. Bailey attempted to push Wellington but lost his footing and fell.

As Bailey lay prone on the ground, Wellington repeatedly struck his face and body with the metal pipe. Anderson also dealt Bailey several blows with his fist and foot.

Wellington walked a short distance away, but almost immediately returned to Bailey (who remained motionless), stomped on his foot, and dealt three more blows to his head with the metal pipe. Wellington and Anderson then departed.

Thrash saw the final blows in the bus's side mirror. He reported the assault to Metro bus operations control, who called 911.

Bailey was comatose when police and paramedics arrived. He was placed on life support with extensive skull fractures, extensive facial fractures, and bleeding inside and outside of the brain. He died within two weeks.

## C. Wellington's identification and arrest

During Thrash's testimony, after he had narrated the events he observed in two of the four surveillance videos without offering his opinion that Wellington was one of the men in the videos, the prosecutor showed Thrash a still photograph (People's Exhibit No. 4) from the second video and asked him if the man in the photo was in the courtroom. Thrash identified Wellington as the man in the photo. Thrash did not see Wellington's face on the night of the homicide; thus, he based the identification on comparing Wellington's features to the photo.

A second Metro bus driver, Andrea Cunningham, testified that three days after the homicide (on January 5, 2019), she saw a police-generated crime alert (People's Exhibit No. 33) that included the same still photo of the man in the video. She immediately recognized the man in the photo as Wellington, who had been a regular passenger on her bus for six months. Later that day, Wellington boarded her bus, and Cunningham flashed the headlights at a passing police car to signal that she believed the suspect was on board. Officers boarded and arrested Wellington. In court, Cunningham identified Wellington as the man in the still photo and in booking photos taken upon his arrest (People's Exhibits Nos. 26-28).

When arrested, Wellington was wearing a black coat, a black hoodie, black gloves, and light gray shoes. Inside the black coat's lining, an arresting officer found a gray-and-blue striped beanie. Inside a duffle bag in Wellington's possession, another officer found a blue bandana and two pieces of metal, one of which looked like a nut or bolt from a metal pipe.

Wellington did not testify and called only one witness, eyewitness identification expert Dr. Mitchell Eisen. Dr. Eisen

7

testified that identifications made in suggestive circumstances, including in-court identifications, are less reliable. He also testified that viewing video of an event may change a witness's memory of the event.

## D.  Jury instructions and closing arguments

Wellington did not request a jury instruction on voluntary manslaughter. The trial court considered whether to deliver such an instruction on its own motion, and determined it would be inappropriate to do so, explaining:

"[T]here's simply no substantial evidence there was any heat of passion or some quarrel that would have justified [the instruction]. It was the bus driver's testimony that he [Thrash] was not able to hear anything as to what the people in the back of the bus were talking about. They [*sic*] were not able to hear any words [from Bailey] other than 'Calm down, let's get off the bus.' And that certainly is not just enough to justify a heat of passion. There was some quarrel. [¶] There was no testimony that there was any physical altercation on the bus or when they were off the bus. You can sort of see some communication between the three people involved, but nothing physical until the victim is knocked to the ground and then beaten."

The court instructed the jury on first degree murder and the deadly weapon allegation. The court also instructed the jury, pursuant to CALCRIM No. 370, that the People were not required to prove that Wellington had a motive, but "[n]ot having a motive may be a factor tending to show the defendant is not guilty or an allegation is not true."

In closing, the prosecutor argued that Wellington was guilty of first degree murder and that the deadly weapon

8

allegation was true because the surveillance videos showed that he fatally struck Bailey with a metal pipe and acted with premeditation and deliberation.  Wellington's trial counsel, James Drake, primarily argued that the prosecution failed to prove Wellington's identity as one of the men in the videos beyond a reasonable doubt.  In the alternative, Drake argued that the prosecution failed to prove Wellington had a culpable state of mind at the time of the homicide, in part because the prosecution presented no evidence that he had a motive.

### E.     Verdict and sentencing

The jury convicted Wellington of first degree murder and found the deadly weapon allegation true.  In a bench trial, the trial court found the prior conviction allegations true.

Drake filed a motion to dismiss Wellington's prior strike convictions pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 and section 1385, subdivision (a).  Although Drake's *Romero* motion did not discuss section 1385, subdivision (c), Wellington filed a handwritten letter to the court requesting that the court dismiss the prior conviction enhancements under that subdivision.

At the sentencing hearing, the trial court heard arguments on the *Romero* motion, read Wellington's letter, and heard statements from Wellington and his mother, among others.  The court partially granted the *Romero* motion and dismissed one of the three prior strike convictions.  The court declined to dismiss two 1999 convictions for a second degree robbery and a first degree burglary.  The court also declined to strike the five-year enhancements for those two prior serious felony convictions, stating:  "I'm aware of my discretion to strike those priors under

[section 1385, subdivision (c)], but I don't think it would be appropriate for me to do so, and I'm choosing not to do so."

The court sentenced appellant to a total prison term of 61 years to life, with the base term comprising 25 years for murder, doubled to 50 years pursuant to the Three Strikes law, plus one year for the deadly weapon enhancement and five years each for the two prior conviction enhancements. Wellington filed a timely notice of appeal.

## DISCUSSION

### A. The trial court properly declined to instruct the jury on voluntary manslaughter.

Wellington contends that the trial court erred under state law and the federal Constitution by declining to instruct the jury on voluntary manslaughter (CALCRIM No. 570) on its own motion.

"Under the California Constitution's due process clause, a trial court must instruct the jury on a lesser included offense, whether or not the defendant so requests, whenever evidence that the defendant is guilty of only the lesser offense is substantial enough to merit consideration by the jury." (*People v. Choyce* (2025) 18 Cal.5th 86, 104.) " ' "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 385.) " 'Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense.' " (*Ibid.*)

"Voluntary manslaughter is considered a lesser, necessarily included, offense of intentional murder." (*People v. Choyce*, *supra*, 18 Cal.5th at p. 104.) Voluntary manslaughter is the unlawful killing of a human being "without malice" and "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).)

"Heat of passion has both objective and subjective components. Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Enraca* (2012) 53 Cal.4th 735, 759 (*Enraca*); see also *People v. Rangel* (2016) 62 Cal.4th 1192, 1225 (*Rangel*) ["the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection"].) "Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation.' " (*Enraca*, at p. 759; see also *Rangel*, at p. 1225 [" '[T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene' "].)

Here, Wellington argues that Bailey provoked him into a heat of passion by stealing a pipe (different from the metal pipe later used to strike Bailey) and committing an unspecified assault. Before trial, Drake argued the second pipe was a "meth pipe" or "pipe used to consume narcotics." However, no evidence concerning drug use or the second pipe's nature was offered at trial. Wellington relies solely on Thrash's testimony that Anderson (while holding the metal pipe) threatened to hit Bailey if Bailey did not return the second pipe and told Bailey, "You

11

cannot be assaulting people. If you assault him, hit him, I'm going to call the police. You need to get off the bus.' "

We conclude that Thrash's testimony was insufficient to justify a heat of passion instruction. As overheard by Thrash, Anderson said that he would call the police *if* Bailey assaulted or hit anyone—not that Bailey *had* done so. The surveillance videos showed that Bailey did not assault or hit anyone before this exchange occurred. Although the videos did not depict the men's interactions, if any, before they boarded the bus, a juror could only speculate that Bailey assaulted Wellington or Anderson before then. "[S]peculation is not evidence and will not warrant the giving of an instruction on a lesser included offense." (*People v. Choyce*, *supra*, 18 Cal.5th at p. 104.)

Even assuming, arguendo, that a jury could have reasonably inferred from Anderson's statements that Bailey stole the second pipe, that inference was insufficient to satisfy either the objective or the subjective element of heat of passion. Objectively, in the absence of any evidence regarding the second pipe's value to Wellington or the manner in which Bailey allegedly stole it, no reasonable jury could find that the pipe's theft " 'would cause an emotion so intense that an ordinary person would simply *react*, without reflection.' " (*Rangel*, *supra*, 62 Cal.4th at p. 1225; see also *People v. McShane* (2019) 36 Cal.App.5th 245, 256 ["The attempt to steal defendant's truck, standing alone, . . . could not constitute adequate provocation [to justify a heat of passion instruction]. As far as our research has revealed, there is no case, in California or elsewhere, holding that a taking of property alone can be sufficiently provocative"].)

As for the subjective element, Wellington did not testify or present evidence that the alleged theft—or any other alleged

12

provocation—incited emotion that "bypassed his thought process to such an extent that judgment could not and did not intervene." (*Rangel*, *supra*, 62 Cal.4th at p. 1225.)  His actions in extending the length of the metal pipe and tying a bandana around his face suggested, to the contrary, that he *exercised* judgment by preparing to attack Bailey and to evade identification.

Thus, we conclude that Thrash's testimony about the argument on the bus did not support a reasonable inference that Bailey engaged in adequate provocation to justify a heat of passion instruction.  (See *People v. Landry* (2016) 2 Cal.5th 52, 98 [testimony that defendant sounded angry when talking to victim just before killing, coupled with defendant's letter in which he alleged victim had threatened him at unspecified time, "d[id] not begin to demonstrate" provocation satisfying heat of passion requirements].)

Wellington also argues that after the three men exited the bus, Bailey provoked him into a heat of passion by pushing Anderson and attempting to push him.  However, the videos showed that *Anderson* first pushed *Bailey*, both before they exited the bus and immediately after.  Moreover, Wellington and Anderson outnumbered Bailey, who was unarmed.  Rather than withdraw when Bailey began to walk away or when he fell to the ground, Wellington pursued him with the metal pipe and used it to beat his face and body as he lay vulnerable on the ground— then walked away and returned to deliver three more blows to his head as he continued to lay motionless.

Because Wellington and Anderson instigated the fight and Wellington escalated it with a deadly weapon when Bailey posed no threat, we conclude that Bailey's pushing Anderson and attempting to push Wellington was insufficient provocation to

13

justify a heat of passion instruction. (See, e.g., *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1313 [trial court properly declined to deliver heat of passion instruction, where defendant was " 'culpably responsible' " for fight he instigated and therefore could not establish "that *he* was provoked when [his victim] took him up on the challenge"]; *People v. Whitfield* (1968) 259 Cal.App.2d 605, 609-610 [victim's participation in fight while armed with only a chair was not provocation reducing murder to voluntary manslaughter, where defendants initiated fight, outnumbered victim two-to-one, used knives, and resumed fight after victim dropped chair].)

We disagree with Wellington's claim that this case is "analogous" to *People v. Le* (2007) 158 Cal.App.4th 516. In *Le*, the Court of Appeal held that a trial court properly delivered a heat of passion instruction based on evidence that the victim's longstanding affair with the defendant's wife, along with the wife's verbal taunts, drove the defendant to kill his wife's lover in an unthinking rage. (*Id.* at pp. 527-528.) The defendant testified that his anger caused him to lose control of himself, and a corroborating witness testified that he "had never before seen [the defendant] so angry." (*Id.* at p. 521.)

Here, in contrast, as explained above, Bailey did not taunt or otherwise provoke Wellington, who did not testify or offer any evidence as to his mental state. (See *People v. Choyce*, *supra*, 18 Cal.5th at p. 105 ["[T]here was simply no evidentiary support for a heat of passion theory. There was no evidence that [the defendant] was attacked, or even verbally abused, by his victims, or that [the defendant] was upset, distraught, hysterical, or otherwise provoked by them"].)

14

In short, we conclude that the trial court properly declined to instruct the jury on voluntary manslaughter because no substantial evidence supported such an instruction. Thus, we need not address the Attorney General's argument that the instruction's omission was harmless beyond a reasonable doubt.

**B.    The record does not demonstrate that Wellington's defense counsel rendered ineffective assistance.**

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958 (*Hoyt*).)

"To make out an ineffective assistance claim on the basis of the trial record, the defendant must show '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*Hoyt*, *supra*, 8 Cal.5th at p. 958.) "All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

Here, Wellington contends that Drake rendered constitutionally ineffective assistance by failing to present a voluntary intoxication defense, by failing to object to Thrash's narration of the surveillance videos and in-court identification of Wellington, and by allegedly mischaracterizing motive as an

15

element of murder during closing arguments.[5]  Below, after summarizing relevant pretrial proceedings, we conclude that Wellington fails to show deficient performance or prejudice on the record before us.

### 1. Additional background

In May 2019, the defense attorney then representing Wellington orally represented that Wellington was not competent to stand trial because "[h]e's bipolar, on heavy medication." Based on that representation, the judge then handling the pretrial proceedings declared a doubt as to Wellington's competence to stand trial and transferred the matter to the mental health court.  In September 2020, Wellington retained Drake as his new counsel.

It appears the mental health court reinstated the criminal proceedings sometime before June 2021, when the trial court, acting on unspecified representations from Drake, declared a doubt as to Wellington's competence and again transferred the matter.  In April 2022, the mental health court reinstated criminal proceedings, finding Wellington competent to stand trial based on a report from Dr. Lydia Bangtson.  Dr. Bangtson diagnosed Wellington with antisocial personality disorder, several substance abuse disorders (including amphetamine-type

---

[5] In passing, Wellington argues that Drake's assistance was ineffective because he failed to request a jury instruction on heat of passion or provocation.  However, as explained above, the trial court considered the issue on its own motion and properly concluded that no substantial evidence justified such an instruction.  Thus, we conclude that Drake's decision not to request such an instruction did not render his performance deficient or prejudicial.

use disorder), and adjustment disorder, but opined that he was competent to stand trial.

In April 2023, Drake moved to continue trial because a recently appointed drug expert, John Jenks, would be unavailable on the date then set for trial. Drake argued that Jenks's anticipated testimony about Wellington's drug use was important to his anticipated defense that Wellington did not act with malice or premeditation. After ordering Drake to present additional evidence regarding Jenks's unavailability, the court continued trial.

In May 2023, in response to the prosecutor's request for expert witness reports, Drake wrote, "[I am] still waiting to hear back from my backup Drug Expert on whether he will be available for trial . . . ." The record contains no further information about Jenks, the "backup" drug expert, or Drake's reasons for not calling a drug expert at trial.

In June 2023, two weeks before trial began on June 28, Drake moved to suppress evidence of a videotaped interview that Wellington gave to detectives upon his arrest three days after the homicide, arguing that the interview was involuntary because Wellington repeatedly stated he was high on methamphetamine during the interview. Drake attached 13 pages of excerpts from the interview transcript. The record does not contain the full transcript, which the trial court stated was over 200 pages long, or the video recording. The court denied the motion to suppress.

At trial, neither party offered any evidence regarding the interview. On both parties' agreement, the trial court excluded any evidence that Wellington was intoxicated at the time of the homicide.

17

## 2. Voluntary intoxication

Wellington contends that Drake's assistance was ineffective because he failed to present evidence that Wellington was allegedly intoxicated on methamphetamine at the time of the homicide and failed to ask the trial court to instruct the jury on voluntary intoxication (CALCRIM No. 625). Because the record is silent regarding Drake's reasons for foregoing a voluntary intoxication defense, Wellington bears the burden to show "there simply could be no satisfactory explanation." (*Hoyt*, *supra*, 8 Cal.5th at p. 958.) We conclude he has failed to meet this burden.

The record affirmatively discloses that before trial, Drake prepared to present a voluntary intoxication defense by moving to continue trial to a date when an appointed drug expert, John Jenks, would be available, and by thereafter attempting to ascertain whether a "backup" drug expert would be available for the continued trial date. The record does *not* affirmatively disclose why Drake did not call Jenks, the "backup" drug expert, or another drug expert at trial.

On this record, we cannot discount the possibility that for reasons unrelated to deficient performance on Drake's part, no drug expert was available for trial. Alternatively, if a drug expert was available, the expert's anticipated testimony might have been unfavorable to Wellington. (See *People v. Datt* (2010) 185 Cal.App.4th 942, 953 ["Since defendant has failed to establish that his trial counsel failed to consult an expert or that such an expert would have been able to provide favorable testimony, he has not shown that his trial counsel was deficient in failing to present expert eyewitness identification testimony"].)

Wellington does not address the aforementioned proceedings regarding a drug expert. Nor does he specify the

evidence of voluntary intoxication that he claims Drake should have presented at trial. For instance, he does not argue—and the record does not indicate—that he was willing to testify but Drake dissuaded him from doing so. Even assuming, arguendo, that was the case, Drake might have had rational tactical reasons to avoid exposing Wellington to cross-examination.

Wellington appears to suggest that Drake should have offered his recorded police interview, or portions thereof, into evidence. Wellington does not argue that any hearsay exception would have applied. Moreover, because the record contains only 13 pages from the interview's over-200-page transcript, we cannot discount the possibility that the omitted pages supplied Drake with a rational tactical reason not to offer any portion of the interview.

We conclude that Wellington has failed to show on the record before us, which does not disclose Drake's reasons for foregoing a voluntary intoxication defense, that "there simply could be no satisfactory explanation." (*Hoyt*, *supra*, 8 Cal.5th at p. 958.) Thus, we must reject his contention that Drake's failure to present a voluntary intoxication defense rendered his assistance ineffective.[6] (*Ibid.*)

---

[6] In passing, Wellington also faults Drake for failing to present evidence that he had a mental illness. However, Wellington does not argue this point under a heading summarizing it and does not support it with citations to legal authority or to pertinent portions of the record, as the Rules of Court require. (Cal. Rules of Court, rules 8.204(a)(1), 8.360(a).) Accordingly, we conclude that he forfeited the issue. (See, e.g., *People v. Flores* (2024) 101 Cal.App.5th 438, 452 [appellant forfeited claim of instructional error by failing to raise it under separate heading or to develop the argument].)

19

### 3. Thrash's narration and identification

Wellington contends that Drake's assistance was ineffective because he failed to object to Thrash's narration of the surveillance videos (which were played for the jury and admitted into evidence) and to Thrash's identification of Wellington based on a still photograph from one video (which was also shown to the jury and admitted into evidence). We address Thrash's narration and identification in turn.

First, Wellington faults Drake for failing to object to Thrash's narration of the videos under the secondary evidence rule codified in Evidence Code section 1523, which generally renders oral testimony inadmissible to prove the content of a writing. However, Drake reasonably could have believed that such an objection would lack merit. In *People v. Gonzalez* (2021) 12 Cal.5th 367, our Supreme Court held that the secondary evidence rule did not prohibit the admission of several detectives' testimony describing and clarifying conversations depicted in videos of an undercover operation the detectives had participated in. (*Id.* at pp. 410-411.) As the first of two independent grounds for this holding, the court reasoned: "[I]t is undisputed that the jury was shown the writings in question (in this case videos), and Gonzalez has cited no case in which the secondary evidence rule was applied when the writing itself was admitted into evidence." (*Id.* at p. 410; see also *People v. Son* (2020) 56 Cal.App.5th 689, 696 [rejecting secondary evidence challenge because appellant cited no such case and appellate court was unaware of any].)

Here, too, the videos were admitted into evidence, and Wellington has cited no case finding a violation of the secondary evidence rule in such circumstances. "The constitutional guaranty of effective assistance of counsel . . . does not require

counsel make every conceivable [objection] to avoid being deemed incompetent." (*People v. Kelley* (1990) 220 Cal.App.3d 1358, 1374.) Thus, we conclude that Drake's failure to object to Thrash's narration did not render his performance deficient.

We further conclude that Drake's failure to object did not prejudice Wellington. Although Wellington argues that Thrash's narration somehow misled the jury as to what the videos conveyed, he does not identify any portion of the narration that was allegedly inaccurate or misleading. "Where no dispute exists regarding the accuracy of the evidence received in lieu of the original writing, any error in admitting such evidence is harmless." (*People v. Panah* (2005) 35 Cal.4th 395, 475.)

Moreover, Thrash's narration was not received *in lieu of* the videos, but *in addition to* them. As Wellington acknowledges, "the jury had the video and was completely capable of viewing and evaluating it . . . ." Indeed, during deliberations, the jury requested and received a laptop for the purpose of viewing the videos. Wellington concedes that "it was difficult to refute the images in the video of the events leading up to and included in the assault." Thus, we discern no reasonable probability that he would have obtained a more favorable outcome had Drake objected to Thrash's narration. (See *Hoyt, supra,* 8 Cal.5th at p. 958.)

As explained below, we similarly conclude that Wellington suffered no prejudice from Drake's failure to object to Thrash's identification of Wellington based on a still photo from one of the surveillance videos. Thus, we need not address whether Drake's performance was deficient in this respect. (*In re Crew* (2011) 52 Cal.4th 126, 150 ["If a claim of ineffective assistance of counsel

21

can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient"].)

Even disregarding Thrash's identification, the evidence of Wellington's identity as the man in the videos and still photo was overwhelming. Andrea Cunningham, who was familiar with Wellington's appearance from his six months as a regular passenger on her bus, immediately recognized Wellington in the photo three days after the homicide. Cunningham also identified him in court as the man in the photo and in booking photos taken upon his arrest. The videos and photos were admitted into evidence, enabling the jurors to make their own comparisons to Wellington's appearance in court.

On appeal, Wellington himself argues that "given the video evidence and Cun[n]ingham's testimony, the jury likely rejected [the defense misidentification] theory out of hand." In addition to that evidence, moreover, the jury received evidence that upon Wellington's arrest three days after the homicide, he was wearing or in possession of many articles of clothing that matched those worn by the man in the videos (including a black coat and a gray-and-blue striped beanie within the coat's lining) as well as a piece of metal that appeared to be from a metal pipe (such as the pipe that the man in the videos appeared to remove a piece from to extend its length).

On this record, we discern no reasonable probability that Wellington would have obtained a more favorable outcome had Drake objected to the additional in-court identification by Thrash. (See *Hoyt, supra*, 8 Cal.5th at p. 958.) Thus, we conclude that his failure to object did not render his assistance ineffective. (*Ibid.*)

### 4. Motive argument

Wellington contends that Drake's assistance was ineffective because his closing arguments allegedly mischaracterized motive as an element of murder that the prosecution bore a burden to prove.

We read the record differently. Drake did not refer to motive as an element of the crime or state that the prosecution bore a burden to prove Wellington had a motive to kill Bailey. Instead, he emphasized the absence of motive evidence as a reason why the prosecution allegedly failed to prove that Wellington acted with intent to kill and premeditation. That argument was consistent with the jury's instruction that "[n]ot having a motive may be a factor tending to show the defendant is not guilty or an allegation is not true."

Thus, we conclude that Drake's motive argument did not render his performance deficient. Moreover, even assuming, arguendo, that the argument erroneously heightened the *prosecution's* burden as Wellington alleges, he fails to explain how that error could have prejudiced his defense.

In sum, we conclude the record does not demonstrate that Drake rendered ineffective assistance.

### C. The trial court acted within its discretion by imposing the enhancements for Wellington's two prior serious felony convictions.

Wellington contends that the trial court abused its discretion by denying his motion under section 1385, subdivision (c), to dismiss two five-year enhancements for prior serious felony convictions under section 667, subdivision (a)(1). The court acknowledged its discretion to dismiss the enhancements but

23

determined that dismissal would not be "appropriate." Wellington did not request any further explanation, and the court did not provide any.

We review the trial court's decision not to dismiss the enhancements under section 1385 for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 374-375 (*Carmony*).) We presume the trial court acted to achieve legitimate sentencing objectives. (*Id.* at pp. 376-377.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.)

Under section 1385, "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." (§ 1385, subd. (c)(1).) Subdivision (c)(2) lists nine mitigating circumstances. (§ 1385, subd. (c)(2).) "In exercising its discretion under this subdivision, the court shall consider and afford great weight to *evidence offered by the defendant* to prove that any of the [listed] mitigating circumstances . . . are present. *Proof* of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (*Ibid.*, italics added.)

"[I]f the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of

24

justice.' " (*People v. Walker* (2024) 16 Cal.5th 1024, 1029 (*Walker*).)

Here, Wellington argues the trial court abused its discretion by denying his motion to dismiss the enhancements because he proved that five mitigating circumstances were present and because the court did not find that dismissal would endanger public safety. As explained below, we conclude the court could have reasonably found that Wellington failed to prove the presence of three mitigating circumstances he relies on. Although we agree that two other mitigating circumstances were present, we conclude that the court's ruling was not irrational or arbitrary because the court could have reasonably found either that dismissal would endanger public safety or that dismissal would not be in furtherance of justice. Thus, we affirm.

### 1. The trial court could have reasonably found a failure of proof as to three mitigating circumstances.

We disagree with Wellington's contention that he proved the presence of the following mitigating circumstances: (1) "[t]he application of an enhancement could result in a sentence of over 20 years" (§ 1385, subd. (c)(2)(C)); (2) "[t]he current offense is connected to mental illness" (§ 1385, subd. (c)(2)(D)); and (3) "[t]he current offense is connected to . . . childhood trauma" (§ 1385, subd. (c)(2)(E)). We address each in turn.

First, on its face, subdivision (c)(2)(C) of section 1385 ("[t]he application of an enhancement could result in a sentence of over 20 years") applies only when a sentence of over 20 years could result *because of the application* of the enhancement. (See *People v. Torres* (July 29, 2025, No. C100501) ___ Cal.Rptr.3d ___ [2025

WL 2113331, at *2] [holding that subdivision (c)(2)(C) of section 1385 did not apply where the defendant was sentenced to 25 years to life for first degree murder, because "the sentence already exceeded 20 years without any enhancement"]; Couzens, Bigelow & Prickett, Sentencing Cal. Crimes (The Rutter Group 2024) § 12:11, subd. (F)(3) ["There will be no entitlement to relief [under section 1385, subdivision (c)(2)(C)] unless it is the application of the term for the enhancement that results in a sentence longer than 20 years"].)

Here, the trial court could not have imposed a lesser sentence for the first degree murder than it did—25 years to life. (See § 190, subd. (a).) Given that sentence, the *application* of the prior conviction enhancements here could not have *resulted* in a sentence of over 20 years, and subdivision (c)(2)(C) of section 1385 did not weigh in favor of dismissal.

Second, we conclude that the evidence before the trial court did not compel the court to find that "[t]he current offense is connected to mental illness." (§ 1385, subd. (c)(2)(D).) In this context, section 1385 defines "mental illness" as "a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders," including bipolar disorder and schizophrenia (among other disorders), "but *excluding antisocial personality disorder* . . . ." (§ 1385, subd. (c)(5), italics added.) "A court *may* conclude that a defendant's mental illness was connected to the offense if, after reviewing any relevant and credible evidence, . . . the court concludes that the defendant's mental illness *substantially* contributed to the

26

defendant's involvement in the commission of the offense."  (*Ibid.*, italics added.)

Here, defense counsel's *Romero* motion asserted that Wellington had been diagnosed with bipolar disorder and schizophrenia, but identified no pertinent evidence.  Wellington's letter to the trial court regarding section 1385 asserted that he "was under a drug induced psychosis" (presumably at the time of the murder), but did not elaborate or mention any specific disorder.  At the sentencing hearing, Wellington told the court: "Mental health issues run in my family, sir, from anxiety [*sic*].  Sometime[s] I hear voices.  I suffer from anti-social personality disorder.  I have suicidal thoughts.  I fear for my life at times, and become paranoid.  Sometimes I see things that aren't real."

To the extent that Wellington relied on antisocial personality disorder, section 1385 expressly excludes that disorder from its definition of mental illness.  (§ 1385, subd. (c)(5).)  Although he also described symptoms that might have been attributable to qualifying disorders (or non-qualifying drug abuse), he alleged that he experienced those symptoms "[s]ometime[s]" or "at times," without claiming or presenting evidence that he experienced them at the time of the murder.

Thus, we conclude that the trial court could have reasonably found an absence of "[p]roof" (§ 1385, subd. (c)(2)) that a mental illness "substantially contributed" to Wellington's commission of the murder (§ 1385, subd. (c)(5)).  (See Couzens, Bigelow & Prickett, Sentencing Cal. Crimes, *supra*, § 12:11, subd. (F)(4) ["the phrase 'substantially contributed' [as used in section 1385, subdivision (c)(5)] clearly implies a factor more significant in weight from that of 'contributing factor' "].)

27

Finally, for similar reasons, we conclude that the evidence before the trial court did not compel the court to find that "[t]he current offense is connected to . . . childhood trauma." (§ 1385, subd. (c)(2)(E).) " 'Childhood trauma' means that as a minor the person experienced physical, emotional, or sexual abuse, physical or emotional neglect." (§ 1385, subd. (c)(6)(A).) As with mental illness, a court "*may* conclude that a defendant's childhood trauma was connected to the offense if, after reviewing any relevant and credible evidence, . . . the court concludes that the defendant's childhood trauma *substantially* contributed to the defendant's involvement in the commission of the offense." (*Ibid.*, italics added.)

Here, defense counsel's *Romero* motion asserted that Wellington "had a difficult childhood and upbringing," but did not identify any pertinent evidence. Wellington's letter to the court stated, "I had a very tra[u]matic childhood. My mom submitted a letter regarding this matter." Although his mother's letter is not in the record, she told the court at the sentencing hearing that she "wasn't there" during his childhood due to her drug addiction, which "destroyed" their family, and that his father was also an addict and had "never been there." Wellington told the court: "My childhood was very, very traumatic, and I was often neglected."

Neither Wellington nor his mother addressed how, if at all, the neglect he experienced as a child affected him at the time of the murder. Thus, we conclude that the trial court could have reasonably found an absence of "[p]roof" (§ 1385, subd. (c)(2) that

28

childhood trauma "substantially contributed" to his commission of the murder (§ 1385, subd. (c)(6)).

## 2. The trial court's imposition of the enhancements despite the presence of two mitigating circumstances was not irrational or arbitrary.

We agree with Wellington that he proved the presence of the following mitigating circumstances: (1) "[m]ultiple enhancements are alleged in a single case" (§ 1385, subd. (c)(2)(B)); and (2) each enhancement "is based on a prior conviction that is over five years old" (§ 1385, subd. (c)(2)(H)). The information alleged enhancements for both of his prior convictions from 1999, which were well over five years old. Those mitigating circumstances weighed greatly in favor of the enhancements' dismissal unless the trial court found that dismissal would endanger public safety. (§ 1385, subd. (c)(2).)

Wellington correctly observes that in determining that dismissal would not be "appropriate," the trial court did not expressly address public safety. But that does not mean the court did not consider the issue. We may not presume error from a silent record. (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.) " ' "A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." ' " (*People v. Nitschmann* (2010) 182 Cal.App.4th 705, 708-709.)

The record supports the reasonable inference that the trial court found dismissing the enhancements would endanger public safety. In partially granting and partially denying defense counsel's *Romero* motion, the court found that the instant murder

was an "extremely brutal" crime that Wellington committed against a "defenseless" victim. The court commented that "you could not have a more premeditated murder than the one committed by Mr. Wellington," observing that Wellington prepared in advance to use the metal pipe against Bailey, and that after striking him with the pipe multiple times and briefly walking away, Wellington "thought about it, and came back and administered additional blows to a defenseless[,] already critically injured human being[,] finishing the job." The court also found that granting the *Romero* motion in full "would be an abuse of discretion" in light of Wellington's criminal history, including but not limited to the two "serious and violent felonies" (robbery and residential burglary) that the court declined to dismiss.

We infer from this record that the trial court implicitly and reasonably found that dismissing the enhancements would endanger public safety, negating any need to assign great weight to the two mitigating circumstances present. (§ 1385, subd. (c)(2).) In the alternative, the record also supports the reasonable inference that the court concluded the brutal nature of Wellington's instant premeditated murder, combined with his significant and escalating criminal history, constituted "substantial, credible evidence of countervailing factors" that "neutralize[d]" the great weight assigned to the two mitigating circumstances, "such that dismissal of the enhancement[s] is not in furtherance of justice." (*Walker*, *supra*, 16 Cal.5th at p. 1036.)

In short, we conclude that Wellington has not met his burden to show that the trial court's ruling was "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at p. 377.) Thus, we affirm.

30

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED


M. KIM, J.

We concur:



ROTHSCHILD, P. J.



WEINGART, J.